UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONNECE MARTIN PHILPOT, *et al.*,

    Plaintiffs,

v.

DISTRICT OF COLUMBIA,

    Defendant.

Case No. 23-cv-671-AHA-MJS

**REPORT AND RECOMMENDATION**

In this case, Plaintiff Ronnece Martin Philpot sues the District of Columbia under the Individuals with Disabilities Education Act ("IDEA").[1] She mainly challenges the Hearing Officer's determination upholding the sufficiency of the District's June 2021 individualized education plan ("IEP") for her minor child, "RP." The Hearing Officer, in that same determination, ruled in Philpot's favor in finding the District's subsequent May 2022 IEP to be inadequate; while Philpot understandably does not challenge that piece of the ruling, she does take issue with the remedy awarded. She insists that the Hearing Officer should have ordered, as she requested, a private school placement for RP and not just compensatory education. Both Philpot and the District moved for summary judgment on these issues (ECF Nos. 6 & 9), and those motions are referred to the undersigned for a report and recommendation. Because the record shows that the Hearing Officer properly determined that the June 2021 IEP was reasonably calculated to enable RP to make appropriate educational progress, and because the Hearing Officer acted within his discretion

---

[1] Strictly speaking, Philpot filed this action both in her name and on behalf of her child, RP. To simplify a bit, the Court refers to both plaintiffs throughout as "Philpot."

1

in crafting an appropriate remedy for the May 2022 IEP deficiencies identified, the undersigned recommends that the Court **DENY** Philpot's motion and **GRANT** the District's cross-motion.

## RELEVANT STATUTORY FRAMEWORK

Congress enacted the IDEA to help ensure all children with disabilities receive a "free appropriate public education" or "FAPE." *See* 20 U.S.C. § 1400(d)(1)(A). This mandate "requires an educational program that is reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 399 (2017).

The "IEP"—or "individualized education program"—is "the centerpiece of the statute's education delivery system[.]" *Id.* at 391. An IEP is a "comprehensive plan" prepared by a child's "IEP Team"[2] that serves as "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)). Under the statute, an IEP must include "a statement of the child's present levels of academic achievement and functional performance," a list of "measurable annual … academic and functional goals," and "a description of how the child's progress toward meeting the annual goals … will be measured." *See* 20 U.S.C. § 1414(d)(1)(a)(i). An IEP must also identify the "special education and related services … that will be provided" to help the child "advance appropriately toward attaining the annual goals." *Id.* At least annually, the IEP Team must review and revise "as appropriate" a child's IEP. *See id.* § 1414(d)(4).

A court reviewing "an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399 (emphasis in original). After all, "Congress has not committed to educational perfection." *Z.B. v. Dist. of*

---

[2] The composition of an "IEP Team" is prescribed by statute, 20 U.S.C. § 1414(d)(1)(B), and generally "includes teachers, school officials, and the child's parents," *Endrew F.*, 580 U.S. at 391.

2

*Columbia*, 888 F.3d 515, 528 (D.C. Cir. 2018); *Leggett v. Dist. of Columbia*, 793 F.3d 59, 70 (D.C. Cir. 2015) ("[A] public school district need not guarantee the best possible education or even a potential-maximizing one.") (citation and quotations marks omitted). Equally important, and as the D.C. Circuit has repeatedly made clear, a judicial assessment of an IEP's "substantive adequacy" must be based on information "as of the time each IEP was created rather than with the benefit of hindsight." *Edward M.R. v. Dist. of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (quoting *Z.B.*, 888 F.3d at 524). Putting these principles together, then, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to ensure the specific student's progress." *Z.B.*, 888 F.3d at 524; *accord Endrew F.*, 580 U.S. at 399 ("The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials.").

## FACTUAL BACKGROUND

The claims here implicate the period between 2020 and 2022, so the Court's factual summary takes a similar focus, with some high-level additional background for context.

RP is currently a twelve-year old student enrolled in the District of Columbia Public School ("DCPS") system. From first through fifth grade, RP attended West Elementary School—renamed a few years back to John Lewis Elementary School—in the Petworth neighborhood of Washington, DC. Throughout that time, he qualified for and received special-education services from DCPS.

During RP's fourth-grade year (2020–21), DCPS administered a series of tests and assessments—including "i-Ready" assessments in math and reading, as well as "ANet" testing in English language arts—and those results indicated RP was struggling academically. (ECF No. 5, Admin. Record ("AR") at 7–8.) RP separately underwent an independent psychological evaluation

3

by Dr. David Cranford, which was finalized in May 2021. (*Id.* at 8). Dr. Cranford concluded that RP was "declining in cognitive function" and demonstrated a "severe language-based learning disability." (*Id.* at 8, 260.) He further reported that RP's "oral language, basic reading, written expression, and math skills were deemed to be in the 'extremely low' range as compared to same-age peers," but noted that RP "did demonstrate adequate oral word fluency" and "relative strength in practical skills." (*Id.* at 8, 261). Based on his evaluation, Dr. Cranford recommended that RP be placed in full-time specialized education for all academic areas. (*Id.* at 8, 261–62).

Around this same time, in March 2021, Philpot filed an administrative due-process complaint challenging the sufficiency of RP's prior IEP. That prior IEP (updated as of November 2020) primarily delivered instruction in a general-education setting, while providing for 8.5 hours per week of specialized instruction outside of general education, along with other services and supports. (AR at 18.) The hearing officer for that complaint issued a determination on June 21, 2021, concluding that RP's then-existing IEP fell short of the IDEA's requirements; the hearing officer ordered the IEP team to "promptly" convene for purposes of preparing a revised IEP that gave "careful consideration" to Dr. Cranford's assessment, including the overall recommendation that RP be "placed in a full-time special education setting." (*Id.* at 8–9, 707.)

The IEP Team convened just a few days later, on June 24, 2021, to create a new IEP for RP's upcoming fifth-grade year (2021–22). (*See* AR at 18.) Philpot participated along with her lawyer (the same lawyer representing Philpot in this case). (*Id.* at 551.) The resulting IEP essentially adopted wholesale Dr. Cranford's recommendations and provided for 20 hours per week of specialized instruction outside general education—meaning, as a practical matter, that all academic instruction would take place in a self-contained special education class known as a "Specific Learning Support" or "SLS" classroom. (*Id.* at 10, 18–19, 565.) The IEP additionally

provided for speech-language pathology services and behavioral support services. (*Id.* at 10, 565.) And the IEP included other specific supports, as well, including "preferential seating so that [RP] could pay more attention, parallel teaching, sentence starters, checklists, chunked texts, highlighted texts, and related supports." (*Id.* at 10, 566.)

The June 2021 IEP's goals, as DCPS's witnesses put it, were written to allow RP to "take hold" of his learning. (AR at 10.) The IEP Team developed those goals based on discussions with RP's teachers, the i-Ready testing assessments, RP's work, and other sources. (*See id.* at 551–71). Several goals were spelled out alongside "Common Core" standards for RP's grade level, but the goals themselves did not require RP to perform at a fifth-grade level. (*Id.* at 554–60).

Neither Philpot nor her lawyer voiced any disagreement with the June 2021 IEP—whether in relation to the IEP's services or its goals—during their participation in the IEP Team meeting when it was developed (or seemingly at any point during the 2021–22 year). (AR at 19.)

On May 23, 2022, the IEP Team met to develop RP's IEP for the 2022–23 school year. (AR at 12–13, 212–31). The resulting IEP carried forward essentially the same levels of specialized instruction and other services and supports as the June 2021 IEP. (*See id.*)

In September 2022, RP began attending McKinley Middle School for sixth grade. (AR at 14.) Apparently, Philpot had applied through the DCPS lottery for placement at Capitol Hill Montessori, where RP was accepted, but Capitol Hill Montessori could not implement his IEP, so DCPS would not enroll him there. Instead, the District enrolled RP at McKinley, where he was placed in a classroom with approximately four to five other children. (*Id.* at 14–15.) Based on recent briefing, the Court understands RP remains enrolled at McKinley today.

**PROCEDURAL BACKGROUND**

Philpot filed the due-process complaint preceding this lawsuit on August 29, 2022, which she later amended on September 29, 2022. Philpot alleged that DCPS violated the IDEA in three ways, by: (1) failing to provide prior written notice before changing RP's educational placement from Capitol Hill Montessori to McKinley for the 2022–23 school year; (2) developing an insufficient IEP in June 2021; and (3) developing an insufficient IEP in May 2022. (AR at 4, 6.) As relief, Philpot requested prospective placement at a private school, High Road of Prince George's County, along with 500 hours of compensatory education. (*Id.* at 25–27.)

The Hearing Officer convened an administrative hearing over the course of two consecutive days (November 30 and December 1, 2022) and issued a determination on December 13, 2022. (*See* AR at 4, 28.) After dismissing the prior-written-notice claim (a decision Philpot does not challenge in this Court), the Hearing Officer turned to evaluating the two IEPs at issue. On that score, the Hearing Officer found the June 2021 IEP was substantively appropriate under the IDEA but reached the opposite conclusion as to the May 2022 IEP. The Hearing Officer then declined to award prospective placement at High Road as a remedy for the May 2022 IEP and instead ordered 150 hours of compensatory education. (*See id.* at 26–27)

Philpot timely filed this action to challenge the Hearing Officer's determination as to the adequacy of the June 2021 IEP and the remedy awarded for the May 2022 IEP violation. (ECF No. 1, Compl.) The parties filed cross motions for summary judgment, which are ripe for resolution.

**LEGAL STANDARDS**

Although motions seeking review of a hearing officer decision are typically framed as motions for summary judgment, the Court does not follow "a true summary judgment procedure" in this context. *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting

6

*L.R.L. v. Dist. of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)). Rather, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the court may receive." *D.R. v. Dist. of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). Put another way, the motion for summary judgment is "the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.G. v. Dist. of Columbia*, 246 F. Supp. 3d 1, 8 (D.D.C. 2017) (citation omitted).

On judicial review under the IDEA, courts "shall grant such relief as [they] determine[] is appropriate," based upon "a preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C); *see also Rowley*, 458 U.S. at 205–06. In doing so, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Rather, courts "must give due weight to the administrative proceedings and afford some deference to the expertise of the [independent hearing officer] and school officials responsible for the child's education." *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 108 (D.D.C. 2010) (citation and quotation marks omitted). In general, "a hearing officer's findings based on credibility determinations of live witness testimony are given particular deference where there is no supplementation of the record." *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76-77 (D.D.C. 2014) (citation and quotation marks omitted). But "a hearing decision 'without reasoned and specific findings deserves little deference.'" *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F. 2d 84, 87 (D.C. Cir. 1991)).

## DISCUSSION

As previewed, Philpot's challenges to the Hearing Officer's determination are twofold. One, she contends the Hearing Officer incorrectly found that the June 2021 IEP provided RP with a FAPE as required by the IDEA. Two, she says the Hearing Officer abused his discretion in

declining to award placement at High Road as a remedy upon finding the May 2022 IEP substantively inadequate. The Court addresses each challenge in turn.

**I.        Appropriateness of the June 2021 IEP**

Start with Philpot's challenge to the adequacy of the June 2021 IEP. Philpot mounts a few specific lines of attack on this front. She primarily argues that because RP "did not make academic progress" during the pendency of the June 2021 IEP (ECF No. 6-1 ("Pls.' Mem.") at 5), the IEP fell short of the IDEA's mandate. Philpot presses this theory with a few different variations, keying off different evidence at different points in her briefing, but those variations all boil down to the same core contention: an insistence that the IEP was inadequate because it ultimately failed to deliver sufficient progress. Beyond that, Philpot complains that the goals established for RP in the June 2021 IEP were inappropriate from the outset. Both challenges are unavailing.

*First*, Philpot's arguments based on the apparent lack of academic progress by RP during the 2021–22 school year rest on a misapplication of the governing law. As the D.C. Circuit has made clear, the "substantive adequacy" of an IEP must be assessed based on information available "as of the time each IEP was created rather than with the benefit of hindsight." *Edward M.R.*, 128 F.4th at 295; *Z.B.*, 888 F.3d at 524. Stated differently, instead of evaluating an IEP's adequacy based on "subsequent progress" that a student may or may not achieve, "the Court must ask whether the IEP was appropriately designed and implemented so as to convey a meaningful benefit[.]" *S.S. v. Howard Rd. Acad.* 585 F. Supp. 2d 56, 66 (D.D.C. 2008) ("Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement.") (citations and quotation marks omitted); *Pavelko v. Dist. of Columbia*, 288 F. Supp. 3d 301, 308 (D.D.C. 2018) ("[T]he adequacy of an IEP can be measured only at the time it is formulated, not in hindsight."); *Dist. of Columbia v. Walker*, 109 F. Supp. 3d 58, 66 (D.D.C. 2015) ("An IEP is a snapshot, not a retrospective. In striving for appropriateness, an IEP must take

8

into account what was, and was not, objectively reasonable when the snapshot was taken, that is at the time the IEP was promulgated.") (citation and quotation marks omitted).

Against this precedent, Philpot gets it wrong in asking the Court to evaluate the June 2021 IEP's substantive adequacy from the vantage of hindsight, with a focus on RP's apparent lack of "academic progress" after the IEP was developed. This includes arguments about RP's test scores and progress notes during and after the 2021–22 school year. More specifically, Philpot points to testing results from October 25, 2021, other testing "done shortly after the conclusion of the June 24, 2021, IEP school year," and progress reports from the 2021–22 school year—all of which she insists suffice to demonstrate why the June 2021 IEP fell short under the IDEA. (Pls.' Mem. at 6, 11; ECF No. 10 ("Pls.' Reply") at 3.) But none of that information was available to the IEP Team when they developed the June 2021 IEP. The same holds true for the classroom observations of RP by one of Philpot's witnesses, Ms. Williams. (Pls.' Mem. at 7–8; Pls.' Reply at 3–4.) Ms. Williams conducted her visit in October 2022 and prepared her observation report in November 2022 (AR at 15, 434–39), long after the June 2021 IEP was completed. Indeed, RP was several months into an updated IEP (the May 2022 IEP) by the time of her visit and report. This type of hindsight evidence is not germane to the sufficiency of an IEP prepared long before the evidence even existed. *See, e.g.*, *N.G. v. E.L. Haynes Pub. Charter Sch.*, 2021 WL 3507557, at *12 (D.D.C. July 30, 2021) ("Testing and expert evaluations from September 2018 and beyond carry little weight in judging the June 2018 IEP as such data were not available … in June 2018.").

For these same reasons, Philpot is wrong to suggest some improper inconsistency with the Hearing Officer considering RP's academic progress during the 2021–22 school year for purposes of evaluating the May 2022 IEP, but *not* the June 2021 IEP.  (Pls.' Mem. at 5 (arguing that RP's lack of "academic progress" during that year should have led the Hearing Officer to find both IEPs

9

inadequate); *id.* at 7 (arguing that the absence of "measurable progress" during the June 2021 IEP proved both IEPs insufficient).) The above analysis makes clear why. The academic data the Hearing Officer discussed from the 2021–22 school year (*i.e.*, RP's test scores, progress notes, and the like) were generally available to the IEP Team when they prepared the May 2022 IEP, so the Hearing Officer appropriately considered the data for those purposes. *See, e.g.*, *K.S. v. Dist. of Columbia*, 962 F. Supp. 2d 216, 221 (D.D.C. 2013) ("Academic progress under a prior plan may be relevant in determining the appropriateness of a challenged IEP."). But the same cannot be said for the June 2021 IEP because none of the data even existed when that IEP was crafted.

*Second*, apart from these hindsight-focused points, Philpot argues that the June 2021 IEP was insufficient because its goals were inappropriate from the outset. (Pls.' Mem. at 9.) But the Hearing Officer reasonably concluded otherwise. And generally, "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Dixon v. Dist. of Columbia*, 83 F. Supp. 3d 223, 234 (D.D.C. 2015) (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003)). The Court believes that such deference is justified here given the Hearing Officer's meaningful engagement with—and resolution of—the seemingly conflicting views presented by both sides.

The Hearing Officer considered, for example, Ms. Williams' testimony that RP's "reading goals were not designed to address [RP's] special education needs," at least in part because they were "focused on comprehension," but the Hearing Officer believed those opinions were contradicted by other evidence in the record. (AR at 20.) As the Hearing Officer explained, the June 2021 IEP's reading goals focused on areas beyond comprehension, for instance. (*Id.*) Moreover, the Hearing Officer found Ms. Williams' testimony on this point to be "not convincing." (*Id.*) Despite her opinion that any "comprehension goals" would be "unrealistic" and "pointless"

because RP supposedly "could not comprehend stories, paragraphs, or sentences," the Hearing Officer correctly pointed out that Ms. Williams' own observations confirmed that RP could read a full paragraph. (*Id.*)[3] These findings are owed deference. *McAllister*, 45 F. Supp. 3d at 76 ("A hearing officer's findings based on credibility determinations of live witness testimony are given particular deference[.]") (citation and quotation marks omitted); *A.G. v. Dist. of Columbia,* 794 F. Supp. 2d 133, 141 (D.D.C. 2011) (reaffirming that a "greater level of deference is often appropriate" for "fact based, credibility-dependent finding[s]" of a hearing officer).) Moreover, the Hearing Officer identified and discussed other evidence reflecting that comprehension-related goals would be appropriate, including Dr. Cranford's May 2021 evaluation. (AR at 20–21.)[4]

Separately, the Hearing Officer considered—and rejected—Ms. Williams' testimony that the June 2021 IEP goals were improperly aligned to RP's grade-level "Common Core" standards, implying that RP was being asked to perform at a fifth-grade level. (AR at 21.) While the IEP referenced "Common Core" standards alongside RP's goals, the Hearing Officer determined there was no evidence introduced to indicate that RP was required to work on—or even received—fifth-grade level reading materials during the 2021–22 school year, which would have been extremely "unlikely" given that RP was placed "in a self-contained special education class with modified instructional standards." (*Id.*) The Court agrees those objections are much ado about nothing.

---

[3] Philpot complains that the Hearing Officer drew the wrong conclusion from this evidence because even though RP essentially read from a full paragraph in class, that was only after he skipped over an earlier paragraph that he supposedly could not read. (Pls.' Reply at 4.) This misses the point. The Hearing Officer did not find that RP could read every paragraph, sentence, or word. He was responding to Ms. Williams' own broad contention that RP "could not comprehend stories, paragraphs, or sentences"—a proposition that the Hearing Officer concluded was undermined by the fact that RP was reading at least some full paragraphs in class, even if not every paragraph or word.

[4] Specifically, Dr. Cranford's evaluation recommended that RP engage in "dialogic reading," defined as "adults asking the child specific questions about reading material." (*See* AR at 262.)

11

*Finally*, two remaining points. One, Philpot's current complaints about the June 2021 IEP are substantially undercut by the fact that she never raised any disagreements with or objections to the IEP when it was finalized, even though both she and her counsel participated in the IEP Team meeting. "While Plaintiffs' failure to object to the services proposed may not be dispositive … it is certainly relevant to an inquiry regarding the appropriateness of the IEP." *E.W.-G. v. Dist. of Columbia*, 2023 WL 2598680, at *6 (D.D.C. Mar. 22, 2023); *see also Jalloh v. Dist. of Columbia*, 968 F. Supp. 2d 203, 212 (D.D.C. 2013) (upholding the sufficiency of the IEP because, among other reasons, the parents "failed to raise any substantive concerns about the IEP" when it was developed); *Hinson v. Merritt Educ. Ctr.*, 579 F. Supp. 2d 89, 103 (D.D.C. 2008) (finding the IEP appropriate, in part, because "[p]laintiff participated in the process and agreed to the IEP at the time it was developed"); *Schoenbach v. Dist. of Columbia*, 309 F. Supp. 2d 71, 89 (D.D.C. 2004) ("[P]arents must talk, or complain, when given the chance."). And two, the June 2021 IEP was directly responsive to—and essentially incorporated in full—Dr. Cranford's May 2021 recommendations, including by shifting RP to a full-time special education placement. The IEP Team increased his special-education services substantially, moving RP from primarily general education (with 8.5 hours per week of special instruction) to a full-time placement in DCPS's SLS program for purposes of academic instruction—*i.e.*, full-time special education. The IEP's demonstrable responsiveness to Dr. Cranford's recommendations, while still drawing input from other appropriate sources, drives home the reasonableness of the Hearing Officer's findings, especially given the absence of any objection from Philpot while the IEP was being developed.

In the words of the D.C. Circuit, the Hearing Officer, "taking account of what the school knew or reasonably should have known of [RP's] needs at the time," appropriately found that the June 2021 IEP "was reasonably calculated to ensure [RP's] progress." *Z.B.*, 888 F.3d at 524.

## II.     Placement at High Road of Prince George's County

That leaves the May 2022 IEP and the remedy awarded. As stated, the Hearing Officer ruled in Philpot's favor in determining that the May 2022 IEP failed to provide RP with a FAPE but rejected Philpot's requested remedy of prospective placement at High Road of Prince George's County. She asks the Court to reverse on that issue. The undersigned sees no basis to do so.

"When a hearing officer ... concludes that a school district has failed to provide a student with a FAPE, it has 'broad discretion to fashion an appropriate remedy[.]'" *B.D. v. Dist. of Columbia*, 817 F.3d 792, 797–98 (D.C. Cir. 2016) (quoting *Boose v. Dist. of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015)). This can include "compensatory education," *see id.*, which takes the form of "educational services to be provided prospectively to compensate for a past deficient program," *Reid*, 401 F.3d at 522. Furthermore, and as relevant here, an appropriate remedy can also include a prospective award of private-school placement in certain cases. *See Branham v. Dist. of Columbia*, 427 F. 3d 7, 12 (D.C. Cir. 2005). Both of these categories of relief "must be tailored to meet the child's specific needs." *Id.*

For prospective-placement relief, in particular, the D.C. Circuit has enumerated "a set of considerations"—often called the "*Branham*  factors"—that are "relevant to determining whether a particular placement is appropriate for a particular student, including the nature and severity of the student's disability, the student's specialized educational needs, the link between those needs and the services offered by the private school, the placement's cost, and the extent to which the placement represents the least restrictive educational environment." *Id.* (citing *Rowley*, 458 U.S. at 202); *see also Q.C-C. v. Dist. of Columbia*, 164 F. Supp. 3d 35, 55–56 (D.D.C. 2016) (applying "*Branham* factors to determine whether prospective placement … is the appropriate remedy"). Notably, "unlike compensatory education," which aims mainly to remedy past failings,

13

"prospective placements address whether a child's [then-current] needs and IEP can be met in a public-school setting." *Adams v. Dist. of Columbia*, 285 F. Supp. 3d 381, 391 (D.D.C. 2018).

In this case, the Hearing Officer determined, based on the *Branham* factors, that a remedy of prospective placement at High Road was unwarranted because there was "little to no testimony or evidence in the record to the effect that the services offered by [High Road] would address [RP's] issues in reading any better than the program at [McKinley] has." (AR at 26.) Resisting this conclusion, Philpot claims the Hearing Officer "completely ignore[d] the testimony of Ms. Harris, the program director at High Road." (Pls.' Mem. at 13.) But the record reveals otherwise. The Hearing Officer expressly discussed the evidence presented by Ms. Harris (referred to in the decision below as a witness "from School C") but found that her testimony fell short of establishing that High Road could offer RP any meaningfully distinct services or supports beyond the ones available at McKinley—whether in terms of class size, instruction methodology, or any special program in reading. (AR at 26.) Philpot fails to point to anything that undermines those points. She simply claims Ms. Harris testified that High Road would "amend the current IEP" based on "new testing" to develop "goals" to align to his "performance levels," at which point it "would be in a position to set goals and to provide an individualized program" for RP. (Pls'. Mem. at 14.) That testimony, even as characterized by Philpot, essentially just describes a standard IEP process, without any real specificity as to how High Road would be particularly suited to address RP's needs in a way that McKinley was not. On this record, the undersigned does not believe the Hearing Officer abused his discretion in declining to award prospective placement.[5]

---

[5] The District urges the Court to reject Philpot's prospective placement claim altogether because she failed to expressly address the *Branham* factors until her reply brief. (ECF No. 13 at 4.) This argument reaches too far. Even though Philpot's opening brief did not invoke *Branham* explicitly, it still addressed most of the relevant factors, at least in substance if not by name. Moreover, the District had a full and fair opportunity to address Philpot's arguments in its own reply brief, so there is no real unfairness at play here.

14

As a final matter, even though Philpot does not challenge the amount of compensatory education awarded, the undersigned is independently satisfied that the Hearing Officer's award was "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *B.D.*, 817 F.3d at 798 (explaining that "compensatory education aims to put a student … in the position he would be in absent the FAPE denial"). Although Philpot requested 500 hours of compensatory education, the Hearing Officer explained that most of those hours were attributable to the 2021–22 school year under the June 2021 IEP, which the Hearing Officer upheld as adequate. (AR at 24.) Accounting only for the May 2022 IEP violations, in proportionate terms, the Hearing Officer instead calibrated the award for the period encompassed by the violation, *i.e.*, spanning approximately four months of school time. (*Id.*) This finding is appropriate.

## RECOMMENDATION

For these reasons, the undersigned recommends that the Court **DENY** Plaintiffs' Motion for Summary Judgment (ECF No. 6) and **GRANT** the District's Cross-Motion (ECF No. 9).

Dated: May 6, 2025

                                                             _____
                                                             MATTHEW J. SHARBAUGH
                                                             United States Magistrate Judge

---

*Cf. Baloch v. Norton*, 517 F. Supp. 2d 345, 348 n.2 (D.D.C. 2007) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond.").

\*   \*   \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).